IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| UTAH NATIVE PLANT SOCIETY & GRAND CANYON TRUST, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE & TOM TIDWELL, in his official capacity as Chief of the United States Forest Service, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** <br><br><br> Case No. 2:16-cv-56-PMW <br><br> Chief Magistrate Judge Paul M. Warner |

Pursuant to 28 U.S.C. § 636(c), the parties consented to have Chief United States Magistrate Judge Paul M. Warner conduct all proceedings in this case, including trial, entry of final judgment, and all post-judgment proceedings.[1]  Defendants the United States Forest Service and Chief of the United States Forest Service Tom Tidwell (collectively, the "Forest Service" or the "agency") have motioned for the court to dismiss the above captioned case pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.[2]

On September 22, 2016, the court held a hearing on the motion.[3]  The Utah Native Plant Society and the Grand Canyon Trust (collectively, "Plaintiffs") were represented by Neil Levine and Aaron M. Paul, and the Forest Service was represented by Assistant United States Attorney Jared C. Bennett.  At the conclusion of the hearing, the court took the motion under advisement. Now being fully advised, the court renders the following Memorandum Decision and Order.

---

[1] *See* Dkt. No. 16.
[2] *See* Dkt. No. 18.
[3] Dkt. No. 30.

**BACKGROUND**

In 1986, the Forest Service prepared a forest plan for the Manti-La Sal National Forest in southeastern Utah ("Forest Plan").[4]  The Forest Plan included a proposal to designate the Mount Peale portion of the forest as a Research Natural Area.[5]  In 1988, the Forest Service designated a 2,380-acre portion of the La Sal Mountain Range the Mount Peale Research Natural Area ("Mount Peale RNA").[6]  The Mount Peale RNA includes much of the La Sal Mountain Range's highest peaks, ridges, and high alpine tundra.[7]

In 2013, the State of Utah (the "State") proposed introducing wild mountain goats onto state-owned land adjacent to the Manti-La Sal National Forest.[8]  Prior to the State implementing its proposal, the Forest Service lodged several objections throughout the State's proposal process, asking the State to delay introducing the mountain goats until further research could be conducted.

In May 2013, the Forest Service sent a letter to the State requesting that the State: (1) develop a statewide management plan for introducing mountain goats and (2) develop specific population goals and objectives for the release location of the mountain goats.[9]  With the help of the Forest Service, the Utah Division of Wildlife Resources ("DWR") developed a statewide mountain-goat management plan to foster goat introduction across Utah ("Statewide Goat Management Plan").[10]  On June 4, 2013, the Utah Wildlife Board approved the Statewide Goat Management Plan.[11]  Subsequently, in August 2013, the DWR completed a La Sal Unit

---

[4] Dkt. No. 2 at ¶ 21.
[5] *Id.* at ¶ 22.
[6] *Id.* at ¶ 23.
[7] *Id.* at ¶ 1.
[8] *Id.* at ¶ 2.
[9] *Id.* at ¶ 37.
[10] *Id.* at ¶ 76.
[11] *Id.* at ¶ 31.

Management Plan, which governed the State's plans to introduce mountain goats onto state-owned land in the La Sal Mountains.[12]

In a July 30, 2013 letter to the State, the Forest Supervisor for the Manti-La Sal National Forest conveyed his concerns that mountain goats "may be inconsistent with the National Forest Service policy on the Mount Peale [RNA]; and might impact three Forest Service regionally sensitive plants."[13]

Similarly, on August 21, 2013, the Regional Forester urged the Director of the DWR to reject the La Sal Unit Management Plan proposal.[14]  In a letter to the Director, the Regional Forester conveyed his concern that the mountain goats might have an adverse effect on the Mount Peale RNA.[15]  The letter stated: "Impacts to these habitats from introduced goats appear contrary to the establishment record for the Mount Peale RNA and inconsistent with Forest Service policy regarding management of RNAs . . . ."[16]  Additionally, the Regional Forester stated that the Forest Service had "serious concern[s] that the additive pressure from current drought cycles and climate change impacts occurring throughout the southwest may impact" plant species in the area.[17]  If the State was unwilling to delay introduction altogether, the Regional Forester asked the Director to delay his decision until the Forest Service and the State could further study the potential impacts of the goats on the Mount Peale RNA.[18]

In September 2013, the State disregarded the Forest Service's objections and began introducing mountain goats onto state-owned land in the La Sal Mountains.[19]  In a letter to the

---

[12] *Id.* at ¶ 32.
[13] *Id.* at ¶ 39.
[14] *Id.* at ¶ 40; Dkt. No. 18 at Ex. A.
[15] Dkt. No. 18 at Ex. A.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] Dkt. No. 2 at ¶¶ 32–35.

Forest Service, the DWR stated that it had "already been working cooperatively with the Forest Service to identify plant monitoring sites and begin monitoring potential goat habitat on the La Sal Mountains."[20]  Additionally, the DWR noted that "[p]retransplant data [had] already been collected" and that the DWR was "committed to future monitoring, including the establishment of additional monitoring sites, as needed."[21]  The DWR further noted:

> Four other Forest Service RNAs in Utah already support populations of Rocky Mountain goats. Three of those RNAs were established after goats were already present in the area, and goats were transplanted to one of the RNAs after the RNA was established. No negative impacts from goats have been documented on any of these RNAs.[22]

By 2014, the mountain goats had entered the Manti-La Sal National Forest and the Mount Peale RNA.[23]  Since the goat introductions, the Forest Service has been attempting to monitor the mountain goats to determine the goats' impact on the Mount Peale RNA and the Manti-La Sal National Forest.[24]

Plaintiffs are non-profit organizations dedicated to the preservation of ecosystems and landscapes across the Intermountain West.[25]  In the summer of 2014, Plaintiffs surveyed the Manti-La Sal National Forest and noted the "adverse impacts of the introduced mountain goats on the Mount Peale [RNA]."[26]  On December 24, 2014, Plaintiffs sent the Forest Service a letter documenting their findings and demanding that the Forest Service remove the goats from Manti-La Sal National Forest.[27]  Additionally, Plaintiffs argued that the Forest Service had neglected its

---

[20] *Id.* at ¶ 42; Dkt. No. 18 at Ex. B.
[21] Dkt. No. 18 at Ex. B.
[22] *Id.*
[23] Dkt. No. 2 at ¶ 35.
[24] *Id.* at ¶ 44; Dkt. No. 18 at Ex. A.
[25] Dkt. No. 2 at ¶¶ 7–8.
[26] *Id.* at ¶ 46.
[27] *Id.* at ¶ 47.

regulatory duty to require the State to obtain a special-use permit for use of the national forest.[28]
On January 16, 2015, after meeting with the Forest Service, Plaintiffs submitted another letter to
the Forest Service reiterating their concerns and requesting that the Forest Service take action.[29]

On May 12, 2015, the Forest Service responded to Plaintiffs' requests.[30]  The Forest
Service reminded Plaintiffs of the states' traditional role in managing wildlife populations.[31]  The
Forest Service acknowledged that its regulations required users of a National Forest System to
obtain authorization from the Forest Service for certain uses.[32]  However, the Forest Service
stated that the State "did not release the mountain goats on [National Forest System] land, and
therefore were not using or occupying [National Forest System] land at the time of the mountain
goat release."[33]  The Forest Service further reviewed Plaintiffs' adverse impact findings and
concluded that Plaintiffs' findings were not dispositive.[34]

The Forest Service ultimately concluded that more research was needed to determine the
impact of mountain goats on the Manti-La Sal Mountain National Forest.[35]  The Forest Service
stated that it had developed a "rigorous five-year monitoring plan to evaluate population trends
of four rare alpine plant species, and track shifts in species composition and ground cover in the
alpine zone, including the Mount Peale [RNA]."[36]  The Forest Service's monitoring plan
includes "recording direct impacts by grazing animals and uses motion sensing camera to

---

[28] *Id.*
[29] *Id.* at ¶¶ 48–50.
[30] *Id.* at ¶ 51; Dkt. No. 18 at Ex. D.
[31] Dkt. No. 18 at Ex. D.
[32] *Id.*
[33] *Id.*
[34] *Id.* ("While the report suggests negative impacts to plants from Mountain Goat foraging, it also indicates a need for more refined data collection. In regard to your monitoring documenting trampling evidence within the Mount Peale RNA, evidence similar to that observed by GCT was documented in the area prior to goat introductions, and your trampling evidence was not clearly demonstrated to be the result of mountain goat use. In addition, your observations were not within a fixed area plot, so the density of trampling occurrences cannot be calculated, or compared to future data to establish a trend.").
[35] *Id.*
[36] *Id.*

determine animal species involved."[37]  After additional fact finding, the Forest Service stated

that it would work cooperatively with the State to take the appropriate course of action, including

deciding "whether or not removal or reduction in population" of the mountain goats is

warranted.[38]

On June 13, 2015, Plaintiffs petitioned the Chief of the Forest Service to address the

State's goat introductions.[39]  Plaintiffs' petition reiterated their prior demands, insisting that the

Forest Service remove the goats, prohibit additional goat introductions, and require a special-use

permit to regulate the State's use and occupancy of the Manti-La Sal National Forest.[40]

On August 7, 2015, the Chief of the Forest Service sent Plaintiffs a letter stating that

before the agency could initiate any action, the Forest Service needed to work with the DWR "to

gather and evaluate data" sufficient to demonstrate agency action was warranted.[41]  The Chief

reminded Plaintiffs that the Forest Service had no authority to control the State's activities on

state-owned lands.[42]  The Chief further stated that it "has not authorized, and has no plans to

authorize, the release of mountain goats on [National Forest System] land in the La Sal

Mountains."[43]

Unsatisfied with the Forest Service's response, Plaintiffs filed the above captioned

lawsuit seeking declaratory and injunctive relief.  Plaintiffs' complaint asserts five causes of

action regarding the Forest Service's decision to allow mountain goats to be introduced onto land

adjacent to the Mount Peale RNA.  The Forest Service subsequently filed a motion to dismiss all

five claims for lack of subject matter jurisdiction.

---

[37] *Id.*
[38] *Id.*
[39] *Id.* at ¶ 52.
[40] *Id.*
[41] *Id.* at ¶ 53; Dkt. No. 18 at Ex. E.
[42] Dkt. No. 18 at Ex. E.
[43] *Id.*

## STANDARD OF REVIEW

Under § 706(2)(A) of the Administrative Procedures Act ("APA"), a district court reviews an agency action to determine if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  To challenge an agency action in federal court, a plaintiff must satisfy the constitutional standing requirements of Article III and the APA's statutory standing requirements.  *See State of Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998).  Under § 702 of the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  To obtain judicial review under § 702, the plaintiff must (1) identify a final "agency" action and (2) "demonstrate that its claims fall within the zone of interests protected by the statute forming the basis of its claims."  *Catron Cty. Bd. of Comm'rs, New Mexico v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990)).

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the court must dismiss a claim for lack of subject matter jurisdiction.  "Subject-matter jurisdiction involves a court's authority to hear a given type of case" and the party invoking federal jurisdiction bears the burden of establishing that the court has subject matter jurisdiction.  *Radil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1224 (10th Cir. 2004) (citations omitted).  Motions to dismiss pursuant to Rule 12(b)(1) take two forms.  First, a party may attack the complaint facially.  *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).  "In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true."  *Id.* (citations omitted).  Second, a party may go beyond the complaint and challenge the factual basis on which the plaintiff seeks to assert the court's subject matter jurisdiction.  *Id.* at 1003.  "Where a party

attacks the factual basis for subject matter jurisdiction, the court does not presume the truthfulness of factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts." *Radil*, 384 F.3d at 1224 (citing *Pringle v. United States*, 208 F.3d 1220, 1222 (10th Cir. 2000)).

The parties dispute whether the Forest Service's motion to dismiss is a facial or factual challenge.[44]  At oral argument, the court indicated that it was inclined to treat the Forest Service's motion as a factual attack.  However, upon further review, the court finds that the Forest Service's motion presents a facial attack rather than a factual attack on subject matter jurisdiction.  The court has not been presented with any affidavits or other evidence not incorporated into the complaint that challenges Plaintiffs' factual assertions of subject matter jurisdiction.  Rather, the parties state the same material facts but disagree as to their legal conclusions.  *Zeligson v. Hartman-Blair, Inc.*, 126 F.2d 595, 597 (10th Cir. 1942) ("The writing was attached to the first amended complaint as an exhibit and its legal effect is to be determined by its terms rather than by the allegations of the pleader.").  Additionally, the court finds no reason to look beyond Plaintiffs' complaint and the documents incorporated into the complaint to ascertain whether the court has subject matter jurisdiction.  Nevertheless, whether the court reviews the Forest Service's motion as a facial or factual attack, the result is the same. Accepting Plaintiffs' factual allegations as true, Plaintiffs have failed to demonstrate that the APA provides the court subject matter jurisdiction over this dispute.

## DISCUSSION

A host of federal laws and regulations govern the Forest Service's management of the National Forest System.  Relevant to Plaintiffs' claims, the National Forest Management Act ("NFMA") requires the Forest Service to "develop, maintain, and, as appropriate, revise land and

---

[44] *See* Dkt. No. 20 at 1; Dkt. No. 25 at v-vi.

resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a).

Additionally, the Forest Service is required to designate portions of the National Forest System

as Research Natural Areas. 36 C.F.R. § 251.23 ("The Chief of the Forest Service shall establish

and permanently record a series of areas on National Forest land to be known as experimental

forests or experimental ranges . . . ."). The purpose of a Research Natural Area is to preserve

portions of the National Forest System for scientific study and educational purposes. *See id.*; *see*

*also* Forest Service Manual § 4063.03. Once a Research Natural Area is designated, the Forest

Service is charged with maintaining the Research Natural Area in its "virgin or unmodified

condition." 36 C.F.R. § 251.23.

      A hallmark of the Forest Service's federal land management duties is the Forest Service's

obligation to work cooperatively with the states to balance the federal government's interest in

land management with the state's traditional police powers. The Multiple Use and Sustained

Yield Act ("MUSYA") provides that "the national forests . . . shall be administered for outdoor

recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. MUSYA

further provides that the Secretary of Agriculture is required "to cooperate with interested [s]tate

and local governmental agencies and others in the development and management of the national

forests." 16 U.S.C. § 530. To comply with MUSYA, the Secretary of Agriculture has adopted

regulations that require Forest Service officials to: "determine the extent to which national

forests or portions thereof may be devoted to wildlife protection in combination with other uses

and services of the national forests, and, in cooperation with [state wildlife management entities,]

. . . formulate plans for securing and maintaining desirable populations of wildlife species." 36

C.F.R. § 241.2. Additionally, the Forest Service is empowered to enter into "general or specific

cooperative agreements" with the states for the management of wildlife. *Id.*

Against this regulatory backdrop, Plaintiffs' complaint challenges two different categories of unlawful agency action. First, Plaintiffs' first and fifth claims allege that the Forest Service engaged in unlawful agency action by (1) denying Plaintiffs' requests for the agency to take action and (2) allowing the State to release mountain goats into the Manti-La Sal National Forest.[45] Second, Plaintiffs' remaining claims challenge the Forest Service's failure to act. Plaintiffs argue that the Forest Service has violated federal law by failing to: (1) require the State to obtain a special-use permit to occupy the Manti-La Sal National Forest; (2) process the State's proposal for a special-use permit; and (3) conduct an environmental impact analysis of the effects of the mountain goats on the Mount Peale RNA.[46]

For the reasons that follow, the Forest Service's motion to dismiss is granted. Plaintiffs have cleverly amalgamated federal law in an attempt to find some pathway to judicial review. Pulling apart Plaintiffs' contortions, the court finds that it has no jurisdiction to review the Forest Service's action or inaction with respect to the mountain goats' occupation of the Manti-La Sal National Forest. At the core of Plaintiffs' complaint is the Forest Service's failure to act in a time frame that would satisfy Plaintiffs' sense of urgency. The Forest Service has not determined whether the goats' presence in the Manti-La Sal National Forest violates federal law or the existing Forest Plan. Nor has the Forest Service decided that it will never act on Plaintiffs' requests. The State acted and now the Forest Service is in the reactionary position attempting to determine what agency action, if any, is warranted. Accepting Plaintiffs' allegations as true, the court finds that Plaintiffs have failed to provide the court any action or inaction on behalf of the Forest Service that is reviewable under the APA.

---

[45] Dkt. No. 2 at ¶¶ 55, 80.
[46] *Id.* at ¶¶ 64, 69, 76.

## I. Forest Service's Actions

Plaintiffs' first and fifth claims allege that the Forest Service has engaged in unlawful agency action by refusing to take action to manage the mountain goats' occupation of the Manti-La Sal National Forest.  Accepting Plaintiffs' allegations as true, Plaintiffs' first and fifth claims are nonjusticiable.  Specifically, Plaintiffs' first and fifth claims fail to meet the APA's final agency action requirement.

### A.  Forest Service Letters

Plaintiffs' first claim faults the agency for ignoring their requests to remove the mountain goats from the Manti-La Sal National Forest, prohibit further releases of mountain goats by the State, and undertake a review process under the Forest Service's special-use permit regulations to regulate the State's use and occupancy of the Manti-La Sal National Forest.[47]  Plaintiffs argue that the goats' presence in the Mount Peale RNA violates Research Natural Area regulations, Forest Service Manuals, NFMA, and the Forest Plan.[48]

The APA provides the court with jurisdiction to review final decisions of an administrative agency.  5 U.S.C. § 704 ("Agency action made reviewable by statute and *final* agency action for which there is no other adequate remedy in a court are subject to judicial review.").  The APA defines an "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  An agency action is considered final when two prerequisites are met.  First, "the action must mark the consummation of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations and citations omitted).  Second, the "action must be one by which rights or obligations have been determined, or from which legal consequences will flow."

---

[47] *Id.* at ¶¶ 55–56.
[48] *Id.* at 58.

*Id.* Plaintiffs' first claim, while comprehensively pled, fails to meet the APA's definition of a final agency action.

> **i.**   **Forest Service's Letters Did Not Mark the Consummation of the Agency's Decision Making**

Under the first prong of the APA's final agency action definition, a plaintiff must demonstrate that the agency action marked the full culmination of the agency's decision making. *Bennett*, 520 U.S. at 177–78.  In other words, the challenged action may not be "merely tentative or interlocutory [in] nature."  *Id.* at 178.  Recently, the Supreme Court reiterated the general rule that not all agency decision making is justiciable.  In *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807 (2016), the U.S. Army Corps of Engineers (the "Corp") issued an "approved" jurisdictional determination that a company's land contained waters of the United States.  *Id.* at 1811.  Under the Clean Water Act, the Corp has a duty to determine whether a particular parcel of property contains "waters of the United States" by issuing "jurisdictional determinations."  *Id.* at 1812.  Jurisdictional determinations can be either preliminary or approved.  *Id.*

The Court noted that an approved jurisdictional determination was final and reviewable under the APA.  *Id.* at 1814–15.  The Court juxtaposed the agency's approved jurisdictional determination with the agency's preliminary jurisdictional determination.  The Court recognized that a preliminary jurisdictional determination is merely advisory in nature and simply indicates that a party's land may contain waters of the United States.  *Id.* at 1813 (quotations and citation omitted).  Conversely, an approved jurisdictional determination is issued "after extensive factfinding by the Corps regarding the physical and hydrological characteristics of the property . . . ."  *Id.*  True, the agency's decision to issue a preliminary jurisdictional determination and engage in investigation involves agency decision making and may be an indicator of future legal

consequences.  However, until the Corp issues an approved jurisdictional determination, the agency's decision is interlocutory in nature and unreviewable under the APA.  *See id.* at 1812–13.

Like the Corp's preliminary jurisdictional determinations, the Forest Service's response to Plaintiffs was nothing more than an interlocutory determination that did not mark the full culmination of the agency's decision making.  As described above, the unique intersection between federal land management and state wildlife management requires the Forest Service to work cooperatively with the states.  Indeed, the mountain goats' presence in the Manti-La Sal National Forest highlights the need for the Forest Service to carefully navigate the intercept of federal and state power.  The Forest Service did not authorize the State to release mountain goats near the Manti-La Sal National Forest.  To the contrary, the Forest Service objected on numerous occasions and asked the State to delay introducing the mountain goats until more research could be conducted.

The State, exercising its inherent authority to regulate wildlife, *see* Utah Code Ann. Title 23 Chapters 13–30, rejected the Forest Service's proposals and proceeded to release mountain goats on state-owned property in the La Sal Mountains.  Now that the animals have migrated to some degree onto federal land, the Forest Service is tasked with determining whether the goats' presence violates federal law and the existing Forest Plan.  To achieve this task, the Forest Service has decided that it needs to gather more information to determine whether or not agency action is warranted.  Contrary to Plaintiffs' assertions, the Forest Service's letters do not mark the Forest Service's "last word" on the mountain goats' occupation of the Manti-La Sal National Forest.[49]

---

[49] Dkt. No. 20 at 13.

### ii.    The Forest Service's Letters Did Not Establish Legal Rights or Obligations

To satisfy the second prong of the final agency action definition, the agency action must be one by which rights or obligations have been determined or from which legal consequences will flow.  *Bennett*, 520 U.S. at 177–78.  "If an agency has issued a definitive statement of its position, determining the rights and obligations of the parties, the agency's action is final notwithstanding the possibility of further proceedings in the agency on related issues, so long as judicial review at the time would not disrupt the administrative process."  *Ctr. For Native Ecosystems v. Cables*, 509 F.3d 1310, 1329 (10th Cir. 2007) (citing cases) (quotations and alterations omitted).

Plaintiffs argue that the Forest Service letters are final notwithstanding the Forest Service's ongoing monitoring efforts because potential monitoring has no bearing on whether the Forest Service has engaged in final agency action.[50]  Plaintiffs contend that future monitoring will not change the fact that the agency "is not immediately removing the goats to keep the Mount Peale RNA 'in a virgin or unmodified condition.'"[51]  Additionally, Plaintiffs claim that monitoring will not "reveal anything about whether the Forest Service has legal authority to prohibit or regulate the State's unpermitted goat occupation of the Manti-La Sal National Forest."[52]

Plaintiffs' arguments are unpersuasive.  The APA's statutory standing requirements in many respects mirror Article III's ripeness and mootness doctrines.  Indeed, the purpose of § 702's finality requirement is to avoid propelling agency action into judicial review prematurely.  *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 648 F. Supp. 2d 140, 147 (D.D.C. 2009) ("[O]ne purpose of the ripeness doctrine—like the APA's final agency action requirement—is to

---

[50] *Id.* at 14.
[51] *Id.* (quoting 36 C.F.R. § 251.23).
[52] *Id.*

prevent courts from prematurely entangling themselves in administrative proceedings." (citing *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807 (2003)).  The APA's litany of jurisdictional prerequisites is designed to protect administrative agencies from "undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004); *Defs. of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1099 (D. Ariz. 2009).

Plaintiffs seek to contravene the limitations of the APA by embroiling the court into an abstract policy disagreement before the agency has concluded what action, if any, is required.  At this stage, the Forest Service's position on the mountain goats' occupation of the Manti-La Sal National Forest is pure speculation.  The Forest Service has not determined that it will never act on Plaintiffs' requests.  Nor has the Forest Service definitively determined that the goats present a danger to the Mount Peale RNA.  The Forest Supervisor and the Regional Forester only acknowledged that the goats *may* have an adverse impact on the Mount Peale RNA.[53] Investigation is only the beginning of the decision making process.  After further study, the Forest Service may determine the goats' occupation is unlawful and may take action to remove the goats from federal land.[54]  Pragmatically and statutorily, the Forest Service is provided latitude to gather the appropriate information before acting—especially where the Forest Service has statutory and regulatory obligations to work cooperatively with the State.  Therefore, until

---

[53] Dkt. No. 2 at ¶ 40; Dkt. No. 18 at Ex. A (stating that the Forest Service has "serious concern[s] that the additive pressure from current drought cycles and climate change impacts occurring throughout the southwest *may* impact" plant species in the area. (emphasis added)); Dkt. No. 2 at ¶ 39 (stating that that mountain goats "*may* be inconsistent with the National Forest Service policy on the Mount Peale [RNA]; and might impact three Forest Service regionally sensitive plants." (emphasis added)).

[54] Plaintiffs cite no authority for the proposition that the mountain goats' occupation of the Manti-La Sal National Forest per se violates federal law.

the Forest Service makes a final determination as to the goats' occupation of the Manti-La Sal National Forest, the Forest Service has not engaged in final agency action.

The court acknowledges that the APA allows the court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  However, Plaintiffs' first claim does not challenge that the Forest Service's letters constitute unreasonable delay.[55] Furthermore, the court's holding does not mean that the Forest Service's position on the goats' occupation of the Manti-La Sal National Forest is always unreviewable.  Indeed, it would be nonsensical if an administrative agency could kick the proverbial can down the road by merely stating that more research must be conducted before acting.  Eventually, after further research, the Forest Service will need to take a position on the goats' occupation of the Manti-La Sal National Forest.  At this stage, the court is merely satisfied that the agency's response to Plaintiffs was interlocutory in nature and, therefore, unreviewable under the APA.

### B.  Forest Service's Purported Approval of the State's Goat Introduction

Plaintiffs' fifth claim fairs no better than their first.  Plaintiffs' fifth claim alleges that the agency unlawfully "allowed the State to release mountain goats in an area that will result in the use and occupancy of the Mount Peale [RNA]."[56]  Plaintiffs argue that the Forest Service's actions violated the Forest Service Organic Act, NFMA, Forest Service's regulations and manuals, and the Forest Plan.[57]  To facilitate their theory, Plaintiffs point to the fact that the Forest Service offered the State resources in developing the Utah's Statewide Goat Management Plan.[58]

---

[55] *See* Dkt. No. 2 at ¶ 59.
[56] *Id.* at ¶ 80.
[57] *Id* at ¶¶ 80–81.
[58] Dkt. No. 20 at 17–18.

Plaintiffs' arguments are remarkable.  It goes without saying that the State, not the Forest Service, has the authority to regulate wildlife on State land.  *See* Utah Code Ann. Title 23 Chaps. 13–30.  Plaintiffs cite no statutory or regulatory authority that would permit the Forest Service to direct state-managed wildlife activity on state land.  Moreover, the Forest Service did not authorize the State to do anything.[59]  To the contrary, the Forest Service repeatedly objected to the introduction of mountain goats on land adjacent the Manti-La Sal National Forest.

Furthermore, lending agency resources to the State to develop a *statewide* management plan does not serve as an implicit blessing to introduce the mountain goats on state land near the Manti-La Sal National Forest.  Indeed, as Plaintiffs allege, the Forest Service immediately opposed La Sal Unit Management Plan, stating its concern that there were too many unknowns surrounding the release of mountain goats in close proximity to the Manti-La Sal National Forest.  Accordingly, Plaintiffs' fifth claim fails to allege an agency action, let alone a reviewable final agency action.

## II. Forest Service's Purported Failure to Follow Special-Use Permitting Regulations

Plaintiffs' second and third claims allege that the Forest Service failed to abide by the Forest Service special-use regulations.  The APA empowers courts to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1); 5 U.S.C. § 551(13) (stating that that the APA's definition of an "agency action" includes the agency's "failure to act").  Merely pointing to a general statutory duty is not enough to invoke jurisdiction under the APA.  To obtain judicial review of an agency's failure to act, a plaintiff must show that the "agency failed to take a *discrete* agency action that it is *required to take*."  *Norton*, 542 U.S. at 64 (emphasis in original).  If a plaintiff fails to demonstrate "a specific, unequivocal command"

---

[59] Plaintiffs' complaint concedes this fact.  *See* Dkt. No. 2 at ¶ 36 ("The Forest Service did not consent to goat introductions in to the La Sal Mountains.").

placed on the agency, the court lacks subject matter jurisdiction.  *Id.* at 63 ("[O]nly agency action

that can be compelled under the APA is action legally *required*." (emphasis in original)).

Forest Service regulations prohibit the "[u]se or occupancy of National Forest System

land or facilities without special-use authorization when such authorization is required."  36

C.F.R. § 261.10(k).  For example, "placing[] or maintaining any kind of . . .  significant surface

disturbance" or "abandoning any personal property" in the National Forest System is generally

prohibited without a special-use permit issued by the Forest Service.  36 C.F.R. § 261.10(a), (e);

36 C.F.R. § 251.50 ("[I]ndividuals or entities must submit a proposal to the authorized officer

and must obtain a special use authorization from the authorized office . . . ."); *see also* 36 C.F.R.

§ 251.50(e)(2).

When an area of the National Forest System is designated a Research Natural Area,

Forest Service regulations state: "occupancy under a special-use permit shall not be allowed [in

Research Natural Areas] . . . unless authorized by the Chief of the Forest Service."  36 C.F.R.

§ 251.23.  The Forest Service Manual prohibits certain activities in Research Natural Areas,

including "grazing, timber cutting, road and trail development, or special uses of a permanent

nature, except to serve research purposes in these areas . . . ."  Forest Service Manual § 2718.14.

Additionally, the Forest Plan for the Manti-La Sal National Forest prohibits "any direct wildlife

habitat manipulation that will detract from those values for which the [Research Natural Area] is

established."  Land and Resource Management Plan, Manti-La Sal National Forest, *available at*

https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5383373.pdf (last visited Mar. 1,

2017).

Plaintiffs' second claim alleges that the Forest Service is neglecting their mandatory regulatory duty to require the State to obtain a special-use permit.[60]  Similarly, Plaintiffs' third claim alleges that the Forest Service was required to treat and process the State's La Sal Unit Management Plan as an application for a special-use permit.[61]  Plaintiffs' claims are clever but lack legal support.

### A.  The Forest Service's Failure to Require State to Obtain Special-Use Permit

Plaintiffs' second claim argues that the State has abandoned personal property and placed a significant surface disturbance in the Manti-La Sal National Forest.[62]  Therefore, Plaintiffs contend, the Forest Service has a mandatory regulatory duty to "prohibit special uses of the Manti-La Sal National Forest without a special use permit or approved management plan."[63]  Plaintiffs' interpretation and application of the Forest Service special-use regulations is incorrect for two reasons.

First, the State did not abandon personal property.  To determine whether property has been abandoned, the critical question is "whether the owner has voluntarily, intentionally, and unconditionally relinquished his interest in the property so that another, having acquired possession, may successfully assert his superior interest."  *Utah v. Rynhart*, 2005 UT 84, ¶ 14, 125 P.3d 938 (quotations and citation omitted).  The State, in conjunction with the Forest Service, is actively monitoring the goats' progress in the La Sal Mountains.  Therefore, there is no plausibility to Plaintiffs' allegations of abandonment.

Second, the Forest Service special-use regulations do not apply to wildlife management between the State and the Forest Service.  Requiring the states to apply for a special-use permit

---

[60] *Id.* at ¶ 65.
[61] *Id.* at ¶ 72.
[62] *Id.* at ¶ 64
[63] *Id.* at ¶ 65.

every time state-managed wildlife enters federal land would render 36 C.F.R. § 241.2 a nullity.

"It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so

construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or

insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quotations and citations omitted);

*Black & Decker Corp. v. C.I.R.*, 986 F.2d 60, 65 (4th Cir. 1993) ("Regulations, like statutes, are

interpreted according to canons of construction.").  Indeed, the court must adopt an interpretation

of the Forest Service regulations that "gives effect to every clause and word." *Marx v. Gen.

Revenue Corp.*, 133 S. Ct. 1166, 117 (2013) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S.

91 (2011)).  Similarly, where specific regulations govern a regulatory problem, specific prevails

over general.  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071

(2012).

    Requiring the State to obtain a special-use permit for migrating state-managed wildlife

would depredate, if not eliminate, 36 C.F.R. § 241.2's regulatory mandate.  To comply with

MUSYA, the Secretary of Agriculture has adopted specific regulations governing the Forest

Service's shared wildlife management responsibilities with the states.  Section 241.2 requires the

Forest Service to: "determine the extent to which national forests or portions thereof may be

devoted to wildlife protection in combination with other uses and services of the national forests,

and, in cooperation with [state wildlife management entities,] . . . formulate plans for securing

and maintaining desirable populations of wildlife species."  36 C.F.R. § 241.2.  Additionally, the

Forest Service is empowered to enter into "general or specific cooperative agreements" with the

states for the management of wildlife.  *Id.*

    Rather than requiring the states to obtain a special-use permit, § 241.2 adopts a flexible

approach which allows the Forest Service to work with the states to determine the best course of

action for wildlife management.  Requiring the states to obtain a special-use permit would contravene § 241.2's regulatory structure.  Moreover, § 241.2 is a specific regulatory mandate governing the Forest Service's shared wildlife management responsibilities with the states. Where a specific regulation answers a regulatory problem, specific regulations prevail over the Forest Service's general special-use regulations.

Furthermore, Plaintiffs cite no binding legal authority for the proposition that the special-use regulations apply to state-managed wildlife entering the National Forest System.  Plaintiffs cite the Forest Service's approval of a special-use permit for Wyoming to engage in "winter elk management activities" on federal land.[64]  This isolated agency act is not precedential and is readily distinguishable.  In Wyoming, the Forest Service granted the state a special-use permit to construct and operate a winter feeding ground for elk in the National Forest System.[65]  Unlike Wyoming's use of the National Forest System, the State did not request to build structures on federal land.  Moreover, Wyoming's special-use permit was not granted to allow Wyoming to release elk on federal land or to govern the possibility of elk entering federal land.[66]

Moreover, aside from lacking legal support, Plaintiffs' second claim also stretches Forest Service regulations beyond feasibility.  It would be a bureaucratic calamity if states had to obtain a special-use permit at any moment state-managed wildlife migrated into the National Forest System.  To illustrate the court's reasoning, the following hypothetical is instructive.  Let us assume that the DWR has an interest in revitalizing the State's Great Gray Owl population to

---

[64] Plaintiffs also unwisely rely on *Friends of the Columbia Gorge v. Elicker*, 598 F. Supp. 2d 1136, 1156 (D. Or. 2009) which was vacated and ordered to be depublished.  2011 WL 3205773, *1 (D. Ore. July 27, 2011).  As a depublished opinion, the Oregon decision cannot be used as persuasive authority and will not be considered by the court.

[65] Dkt. No. 20 at Ex. 33 ("[Wyoming Game and Fish Commission] will maintain and operate one elk tagging corral, one horse corral, one tack shed, one haystack yard containing two hay sheds, spring and trough developments including protective fencing and piping, and a feeding ground associated with their ongoing winter elk management program.").

[66] *See id.*

deal with a growing invasive rodent species.  *See* Nate Carlisle, *Great Gray Owl is Confirmed in Utah For First Time in 28 Years*, THE SALT LAKE TRIB., Feb. 18, 2017, *available at* http://www.sltrib.com/home/4959794-155/great-gray-owl-is-confirmed-in (last visited Mar. 1, 2017).  To achieve its goal, the State introduces Great Gray Owls all over Utah and, like birds do, some owls migrate onto federal land.  Accepting Plaintiffs' interpretation of the Forest Service special-use regulations, Utah would need to anticipate the owls' migration and apply for a special-use permit on the off chance an owl entered the National Forest System.  Such an undertaking would not only be unmanageable, but would disregard the Forest Service's duty to work cooperatively with the State to manage wildlife.

Accordingly, Plaintiffs have failed to allege the Forest Service neglected a specific, unequivocal command to act.  Therefore, the court lacks jurisdiction over Plaintiffs' second claim.

**B. Failure to Process State's Special-Use Permit**

Plaintiffs' third claim alleges that the Forest Service neglected its regulatory obligation to treat the State's La Sal Unit Management Plan as an application for a special-use permit.[67] Plaintiffs allege that the "Forest Service violated its special-use permit regulations regarding the State's proposal to use and occupy the Manti-La Sal National Forest" by failing to "screen the State's proposal and reject the State's proposal during the screening process.[68]

Like Plaintiffs' second claim, the court lacks subject matter jurisdiction over Plaintiffs' third claim.  As noted above, the Forest Service's special-use regulations do not govern this dispute.  Moreover, even if the special-use regulations applied and accepting Plaintiffs have

---

[67] Dkt. No. 2 at ¶ 72.
[68] *Id.*

standing to challenge the agency's purported failure to process the State's special-use permit,[69] there is no support for Plaintiffs' conclusion that the State's La Sal Unit Management Plan is in actuality a petition for a special-use permit.  The State did not ask the Forest Service permission to do anything.[70]  The State released mountain goats on to state-owned land and merely apprised the Forest Service of its decision.  The Forest Service cannot be challenged for failing to process a request for a permit it never received.  Accordingly, Plaintiffs' third claim fails for lack of subject matter jurisdiction.

### III. Violations of the NEPA

Plaintiffs' fourth claim alleges that the Forest Service "entirely or partly assisted, conducted, regulated and approved the introduction of mountain goats into the Manti-La Sal National Forest" by aiding the State in creating a Statewide Management Plan and the La Sal Unit Management Plan.[71]  Therefore, Plaintiffs allege that the Forest Service violated the National Environmental Policy Act ("NEPA") by failing to conduct an environmental analysis before the mountain goat introduction.

At the outset, the court notes that Plaintiffs' pleadings are inconsistent.  Plaintiffs allege that the Forest Service "did not authorize the State's use of the National Forest for establishing a goat population" while simultaneously asserting that the State "entirely or partly assisted" the State's goat introduction.[72]  Disregarding Plaintiffs' pleading inconsistencies, the court finds that

---

[69] The court questions whether Plaintiffs have standing to challenge a procedural right allegedly denied to the State.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.").  However, for purposes of resolving this motion, the court will assume Plaintiffs have standing.

[70] Dkt. No. 2 at ¶ 2 ("The Forest Service did not authorize the State's use of the National Forest for establishing a goat population.").

[71] *Id.* at ¶ 76.

[72] *Id.* at ¶¶ 2, 76.

the Forest Service has not engaged in an action let alone a major federal action that would trigger the requirements of NEPA.

NEPA requires federal agencies to prepare a "detailed statement" for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C) NEPA defines a "major federal action" to include "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. When the federal government acts in conjunction with another entity, "[t]he requirements of NEPA apply only when the federal government's involvement in a project is sufficient to constitute major federal action." *Vill. of Los Rancho de Albuquerque v. Barnhart*, 906 F.2d 1477, 1480 (10th Cir. 1990) (quotations omitted).

For example, in *Barnhart*, New Mexico sought to construct two bridges in a rural area. *Id.* at 1478. At the beginning of the project, the Federal Highway Administration ("FHWA"), authorized federal funding for the bridges and provided several employees to aid New Mexico in preparing its environmental analysis. *Id.* at 1479. New Mexico ultimately decided to fund the project without the help of the FHWA. *Id.* Subsequently, the plaintiffs sued the FHWA claiming that the FHWA violated NEPA by approving New Mexico's environmental impact statement. *Id.* at 1480. Despite the FHWA's assistance in developing an environmental impact statement, the Tenth Circuit held that NEPA did not apply because New Mexico declined federal involvement in the project and New Mexico was not required to obtain federal permission to build the bridges. *See id.* at 1481–82. The Tenth Circuit noted, "[i]f the highway is not a federal action, then a state's decision to avoid federal involvement cannot have the paradoxical effect of establishing federal involvement." *See id.* at 1481 (quotations and citation omitted).

Like *Barnhart*, the Forest Service's involvement in developing the State's goat management plans does not have the effect of establishing major federal involvement.  Aside from lending agency expertise and experience, Plaintiffs have not alleged that the Forest Service funded the State's project in any way.  Additionally, the State was not required to obtain the Forest Service's permission to conduct wildlife management activities on state-owned land. Therefore, the court finds that Plaintiffs have failed to allege that the Forest Service neglected to take a discrete agency action required by NEPA.  Plaintiffs' fourth claim is dismissed for lack of subject matter jurisdiction.

## CONCLUSION

Based on the foregoing, the Forest Service's motion to dismiss is granted as to all causes of action.[73]  The court finds that Plaintiffs' complaint fails to invoke the court's subject matter jurisdiction under the APA.

**IT IS SO ORDERED**.

DATED this 2nd Day of March, 2017.

BY THE COURT:

PAUL M. WARNER
Chief United States Magistrate Judge

---

[73] Dkt. No. 18.